J-S19013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| --- | --- | --- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARTIN POLLOCK | : | |
| | : | |
| Appellant | : | No. 147 EDA 2022 |

Appeal from the Judgment of Sentence Entered December 20, 2021
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0005314-2019

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED AUGUST 23, 2022**

Martin Pollock appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas on December 20, 2021, following his convictions for aggravated assault and related charges. On appeal, Pollock contends the evidence was insufficient to support his conviction for aggravated assault. After careful review we affirm.

The trial court accurately summarized the facts as follows:

On February 27, 2019, Aaron Weston was driving his 2013 black Jeep Grand Cherokee [with a personalized Pennsylvania license plate] along Jenkintown Road in Cheltenham Township, Pennsylvania. As [] Weston approached [Pollock]'s residence at 7907 Jenkintown Road, Cheltenham, [Pollock] ran towards [] Weston's vehicle. [] Weston slammed on his brakes. A verbal altercation ensued wherein [Pollock] told []Weston to "slow the fuck down." [Pollock] and [] Weston exchanged words, and then [] Weston drove away.

_____

[*] Former Justice specially assigned to the Superior Court.

[] Weston drove on Jenkintown Road every Monday through Friday to pick up his daughter[], from daycare. During the trial, [] Weston testified that his daughter was age 5 (which means she was about three years old at the time of the July 22, 2019 shooting, which is described below).

Shortly after the confrontation, [Pollock] called the Cheltenham Police Department alleging that multiple cars (and specifically a black Jeep with yellow brake pads and [Weston's personalized Pennsylvania license plate]) were speeding down Jenkintown Road. Officer Jacob Outland ("Ofc. Outland") responded to the call and spoke with [Pollock]. Ofc. Outland then ran the tag and responded to [] Weston's address concerning [Pollock]'s report of speeding. Following his conversation with [] Weston, Ofc. Outland returned to [Pollock]'s residence and stated that he had spoken with the driver of the black Jeep[]. [] Weston told Ofc. Outland that he drives on Jenkintown Road almost every day to drop his kid at daycare. Ofc. Outland informed [Pollock] of that fact.

Almost five (5) months later, on July 22, 2019, after picking up his daughter from daycare, []Weston proceeded to drive on Jenkintown Road near [Pollock]'s residence at which time he noticed [Pollock] standing near a tree. []Weston heard a loud noise as he drove past [Pollock]'s residence. He continued driving on Jenkintown Road and pulled his car over at a nearby intersection. He then observed bullet holes in the rear driver's side door, and his daughter complained that her leg burned; at that point, []Weston called 911. He checked on his daughter and observed a welt on her thigh.

Cheltenham Police, including Sergeant Joseph W. O'Neill ("Sgt. O'Neill"), responded to []Weston's 911 call at approximately 5:56 p.m. Sgt. O'Neill met Officer Brian Hopkins at [Pollock]'s address. Sgt. O'Neill detained [Pollock], removed him from the scene, and placed him in the back of a police vehicle at a traffic post by Ashbourne Road. At that time, Sgt. O'Neill explained to [Pollock] he was being detained because he was being accused of firing a rifle or shotgun at a moving vehicle. []Weston was brought to the location where police had detained [Pollock], and []Weston positively identified [Pollock]. At that time, Sgt. O'Neill advised [Pollock] he was under arrest for shooting at []Weston and his daughter.

Police executed a search warrant on [Pollock]'s residence the following day, July 23, 2019. Among the items recovered were the following:

(a) A Remington 870 Express shotgun, black in color, with one (1) live round, Serial Number ABl 76630M.;

(b) Legal pads with []Weston's (and others') vehicle information.; and

(c) Papers that contained notes regarding vehicles, including []Weston's vehicle. These papers constitute a log that sets forth dates and times when certain vehicles would pass a particular intersection. []Weston's vehicle is clearly identified by the writing "Blk Jeep/yellow calipers" and [Weston's personalized license plate].

[Pollock] fired a double-aught buckshot at []Weston's vehicle as he drove past [Pollock]'s residence on July 22, 2019. As the ballistic expert explained, that type of ammunition is designed for larger game such as deer or for defensive use.

Law enforcement interviewed [Pollock] at 5:45 p.m. on July 23, 2019, the day following the shooting. [Pollock] told police that he used a legal pad to record details regarding []Weston coming and going in his vehicle.

[Pollock] stated to police during that interview that he decided to take action the prior day because "it was just the final straw. Just one more time of this guy coming, racing by, and I felt he was harassing me by doing this."

[Pollock] stated to police that he thought []Weston was a drug dealer due to []Weston's "coming back and [forth] every two hours." He also testified as to this belief:

ADA: What I'm asking you is, what was the basis for him being a drug dealer? What were the clues that led you to that?

[Pollock]: I have no idea. I just thought it was very suspicious that this car would come and go every 20 minutes. So I guess watching too many detective shows on TV.

During trial, [Pollock] reiterated his belief that []Weston was harassing him by allegedly speeding past [Pollock]'s residence.

At trial, [Pollock] took the stand in his defense. [Pollock] testified about cars allegedly speeding on Jenkintown Road. [Pollock] testified that, to address this, he took the following actions: (1) cut down a neighbor's branch that had overgrown the speed limit sign; (2) parked his car in front of his house (in an effort to slow traffic as Jenkintown Road is a narrow street); (3) wrote a letter to his neighbors; and (4) made 911 calls to Cheltenham Police.

He further testified that the day of the shooting he retrieved his shotgun from his residence and loaded two (2) rounds. He walked to a tree on his neighbor's front yard around "5:00 ish" [p.m.] He went outside with his shotgun "[b]ecause - I don't know his name - had driven by earlier at a high rate of speed.

[Pollock] laid the shotgun in a tree branch and waited about 10-15 minutes for []Weston to return and drive past [Pollock]'s residence. While he testified that he was only intending to scare the driver ([]Weston), he also claimed that the gun went off accidentally.

ADA: Was your finger on the trigger?

[Pollock]: It seemed like, when I went and put my hand on it, my finger must have brushed against the trigger and it went off.

Trial Court Opinion, 4/5/2022, 1-4 (citations omitted).

Pollock was charged with 16 counts: Count 1 - criminal attempt to commit first degree homicide, Count 2 - first degree homicide, Counts 3 through 6 - aggravated assault, Counts 7 and 8 - recklessly endangering another person, Count 9 - discharge of a firearm into an occupied structure, Count 10 - propulsion of missile into occupied vehicle, Count 11 - possession of an instrument of crime, Count 12 - criminal mischief, and Counts 13 through 16 - simple assault.

Following a bench trial, the court found Pollock not guilty of Counts 1 and 2, and guilty of all the remaining counts. On December 20, 2021, the court sentenced Pollock to an aggregate term of four to eight years' incarceration, followed by two years' probation. This timely appeal followed.

Pollock raises three issues on appeal, all challenging the sufficiency of the evidence to support his aggravated assault conviction.

> 1. Whether the evidence introduced at trial and all reasonable inferences derived from the evidentiary record, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to establish all elements of Aggravated Assault, beyond a reasonable doubt since [Pollock] did not: attempt to cause serious bodily injury to another or intentionally, knowingly, or recklessly cause injury under circumstances manifesting extreme indifference to the value of human life?
>
> 2. Whether [Pollock] lacked the *mens rea* necessary to support a conviction for Aggravated Assault?
>
> 3. Whether [Pollock]'s actions rose to the requisite level of *mens rea* to show malice, since recklessness manifesting extreme indifference to the value of human life was not proven to establish Aggravated Assault?

Appellant's Brief, at 6.

Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. *See Commonwealth v. Dale*, 836 A.2d 150, 152 (Pa. Super. 2003). The Commonwealth may meet this burden

of proving every element of the crime by utilizing only circumstantial evidence. *See Commonwealth v. Bruce*, 916 A.2d 657, 661 (Pa. Super. 2007).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Id*. (citation omitted). Any doubt raised as to the accused's guilt is to be resolved by the factfinder. *See id*. "As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record." *Commonwealth v. Kinney*, 863 A.2d 581, 584 (Pa. Super. 2004) (citation omitted). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Bruce*, 916 A.2d at 661 (citation omitted).

Pollock's conviction for aggravated assault required the Commonwealth to prove that he attempted "to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1). "Serious bodily injury" is any "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

Here, it is undisputed Pollock's actions did not inflict serious bodily injury. Accordingly, to sustain an aggravated assault conviction, the Commonwealth needed to show Pollock attempted to cause serious bodily

injury to another. **See Commonwealth v. Galindes**, 786 A.2d 1004, 1012 (Pa. Super. 2001) ("The Commonwealth, in sustaining an aggravated assault conviction, need only show the defendant attempted to cause serious bodily injury to another, not that serious bodily injury actually occurred.").

> Attempt, for aggravated assault purposes, is found where the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetrating serious bodily injury upon another. The Commonwealth can establish specific intent from the circumstances surrounding the incident.

**Id**. (citations and internal quotation marks omitted). Intent may be inferred if the defendant engaged in reckless conduct that is likely to result in serious bodily injury. **See Commonwealth v. Wanamaker**, 444 A.2d 1176, 1178 (Pa. Super. 1982). In **Wanamaker**, we held that firing a gun constitutes the type of conduct that is likely to result in serious bodily injury, and therefore the intent element of aggravated assault was satisfied. **See id.** at 1178.

In his first two issues on appeal, Pollock challenges the sufficiency of the evidence to establish he acted recklessly. **See** Appellant's Brief, at 17-18. Viewing the evidence in the light most favorable to the Commonwealth, we find there was sufficient evidence to support the aggravated assault charge. Here, Pollock conceded he brought a loaded shotgun to the street and aimed it at the road, waiting for Weston to drive past him. Pollock testified on the one hand that he did not intend to fire the shotgun and that it went off accidentally, and on the other hand that he only intended to scare Weston by shooting *behind* his car. The trial court, sitting as fact-finder, was not required

to credit this testimony. Importantly, the mere fact Pollock loaded the shotgun before bringing it outside is sufficient evidence to support the trial court's credibility determination. The trial court could reasonably find that if Pollock truly had no intention of firing the gun, he would have no reason to load it.

In his third issue Pollock contends his actions did not rise to the requisite level of *mens rea* to show malice, since recklessness manifesting extreme indifference to the value of human life was not proven. We begin by noting that Pollock's argument on this issue is exactly four sentences long. While he cites three authorities, his only attempt at applying the authorities to the present case is this: "Appellant contends that his actions, though negligent and perhaps reckless, did not rise to the level of malice." Appellant's Brief, at 21 (citing **Commonwealth v. McHale**, 858 A.2d 1209 (Pa. Super. 2004)).

However, as eloquently stated in **McHale**, malice can be established where the defendant does "not actually intend that anyone be injured or killed, but by continuing to act … [the defendant] demonstrates that he simply does not care whether harm befalls another." **Id.** at 1214. As explained above, the trial court was entitled to find Pollock intended to fire the shotgun at Weston's car. This conduct and state of mind is more than sufficient to establish Pollock simply did not care whether he harmed Weston or any passenger in the car. Pollock's final argument merits no relief. As we find Pollock is not entitled to relief on any of his claims, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/23/2022</u>